COURT OF APPEALS OF VIRGINIA

Present:  Judges Fulton, Causey and Bernhard

UNPUBLISHED

RANDY CONNELLY

MEMORANDUM OPINION*

v.       Record No. 0863-24-1                    PER CURIAM
                                                 JUNE 24, 2025

W&M CONTRACTING LLC, ET AL.


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

(David M. Snyder; ChasenBoscolo Injury Lawyers, on brief), for
appellant.

(Julio Cesar Muñoz, Jr.; Lynn McHale Fitzpatrick; Franklin &
Prokopik, P.C., on brief), for appellees.


Randy Connelly broke his left arm while "on a job site" at W&M Contracting LLC

(W&M).  He filed a claim for medical benefits under Code § 65.2-603 and a continuing award of

temporary total disability compensation beginning July 20, 2023.  W&M agreed that Connelly

experienced an injury arising out of and in the course of his employment and that Connelly had

experienced causally related temporary total disability for the claimed period.  However, W&M

argued that Connelly was an independent contractor and not an employee during the accident.

The Commission denied medical and temporary total disability benefits based on the

finding that Connelly was "an independent contractor and not an employee."  The Commission

reasoned that W&M did not "exercise the requisite control over the means and methods in which

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

the claimant performed his duties, i.e., overseeing the subcontractors." For the reasons below, we reverse and remand this case to the Commission for further proceedings.[1]

## BACKGROUND

W&M was the general contractor for a restaurant remodel in the beginning of 2023. W&M hired several subcontractors to complete the remodel. W&M's co-owner, Michael Maisel, and Connelly agreed that Connelly would work as a construction "superintendent" for the "length of the project" or until "[they] needed him no longer," because all other W&M employees were unavailable.[2] Connelly never signed a written contract but had a "verbal agreement" with W&M for a negotiated, hourly wage paid by check every two weeks. Connelly's paycheck from W&M was payable to Connelly's business, "Connelly Construction."

Maisel stated that he specifically "dictated [Connelly's] schedule[,]" and Connelly testified that he could not have "left [the] job and gone somewhere else to do work during the course of a given day." Connelly was required "to coordinate the subcontractor[s,] oversee the job[,] open things up[,] and keep the job going." W&M's other co-owner, Michael Watson, confirmed that Connelly's duties were to "oversee[] subcontractors that were on site" and to "open" and "close" the job site.

For four months, Connelly worked "anywhere from 40 to 60" hours a week and recorded his hours on W&M's provided time sheet. Connelly submitted daily reports using an application

---

[1] After examining the briefs and record in this case, the Court unanimously holds that oral argument is unnecessary because "the dispositive issue . . . ha[s] been authoritatively decided." Code § 17.1-403(ii)(b); Rule 5A:27(b).

[2] In the past, Connelly had worked approximately six jobs for W&M, with each job lasting around three to six months. During those periods of employment, the parties knew that Connelly could be terminated at any time.

(app) called Raken,[3] updated W&M on "[w]hat subcontractors were there, what they did, [and] what work they performed." At the directive of W&M, Connelly also met with third-party inspectors, and if anything was incorrect, Connelly would report it to W&M. Connelly did not participate in the hiring, firing, scheduling, or choosing of any of the subcontractors; he was only to "babysit" the subcontractors as Maisel stated in his preliminary text message solicitation. Watson and Maisel also stated that "a normal superintendent who [is] an employee" would have had "more control" over the subcontractors than Connelly did.

According to Connelly, W&M's owners were his "direct supervisors." Watson did not "supervise" Connelly "day by day" but testified that Maisel was the one who handled "the day-to-day interactions" and the "field activities." Maisel, in turn, testified that he was usually on the job site anywhere from daily to two times a week. When on site, Maisel would "discuss layout, control, subcontractors, means, methods, logistics, [and] standard job progress" with Connelly. Neither Watson nor Maisel "instruct[ed]" Connelly on how to manage the subcontractors, but they also did not do so for any of their other employees because they expected that their employees would "know what they're doing."

For this job, Connelly did not use W&M's tools except for a "hard hat." Connelly did not wear a uniform and drove his personal truck. That said, both Watson and Maisel stated that the job often only required a phone, truck, and hard hat. W&M also does not provide its employees with these materials but sometimes would give "truck" and "phone allowances." W&M did not provide Connelly health insurance, performance reviews, nor income increases. Connelly was also never told that he needed to provide his own insurance and believed that W&M would cover him if an accident occurred because he was an "hourly" employee.

---

[3] Throughout the record and the parties' briefs, the Raken construction management app is spelled "Rankin," "Rakin," "Rankin," and "Raken."

On the day of the accident, Connelly checked the back door on the jobsite to make sure it was locked. He then took pictures on Raken for his daily report to submit to W&M. As he was doing this, Connelly tripped and fell over a foot-high tree stump. When Connelly fell, he broke his arm. Connelly filed a claim stating that he sustained a compensable injury by accident to his left arm.

The deputy commissioner denied Connelly's claim stating that "the employer hired [Connelly] to oversee the subcontractors working on a restaurant buildout project" and therefore Connelly was an independent contractor.[4] On review, the Commission affirmed the deputy commissioner's opinion denying medical and temporary total disability benefits based on the finding that Connelly was "an independent contractor and not an employee." The Commission reasoned that Connelly "failed to establish that he was an employee" because he "owned his own construction company" and because the other existing employees were "paid by salary[] and [were] provided different reimbursements." *Connelly v. W&M Contracting LLC*, JCN VA02000040285, slip op. at 4, 6 (Va. Workers' Comp. Comm'n May 9, 2024) (unpublished). They also stated that "[c]rucially, the employer simply did not exercise the requisite control over the means and methods in which the claimant performed his duties, i.e., overseeing the subcontractors." *Id*. at 6. The Commission held that Connelly's required use of the "app on his telephone to report information to the employer" was not enough to satisfy the factor of control. *Id*. Connelly appealed. Connelly argues, inter alia, that the Commission erred in finding that he was an independent contractor and not an employee of W&M.

---

[4] Specifically, the Commission held that "no employer-employee relationship existed between [Connelly] and [W&M] because [W&M] reserved no power to control the means and methods by which [Connelly] was to accomplish his work." *Connelly v. W&M Contracting LLC, et al.*, JCN VA02000040285, slip op. at 11 (Va. Workers' Comp. Comm'n Feb. 7, 2024) (unpublished).

ANALYSIS

"A claimant seeking benefits under [the Workers' Compensation Act] bears the burden of establishing that he is an employee . . . ." *Creative Designs Tattooing Assocs. v. Estate of Parrish*, 56 Va. App. 299, 307 (2010). "An independent contractor is not an employee for Act purposes." *Id.* "The determination as to whether an individual is an employee, or an independent contractor, accordingly, 'involves a mixed question of law and fact which is reviewable on appeal.'" *Id.* at 308 (quoting *County of Spotsylvania v. Walker*, 25 Va. App. 224, 230 (1997)). Decisions of the Commission "shall be conclusive and binding as to all questions of fact." Code § 65.2-706(A). But we review the Commission's legal determinations de novo. *See Wardell Orthopaedics, P.C. v. Colonna's Shipyard, Inc.*, 72 Va. App. 296, 301 (2020) ("[W]e examine the Commission's ruling using a *de novo* standard of review").

"As a general rule, a person is an employee if he works for wages or a salary and the person who hires him reserves the power to fire him and the power to exercise control over the work to be performed." *Behrensen v. Whitaker*, 10 Va. App. 364, 367 (1990) (quoting *Richmond Newspapers, Inc. v. Gill*, 224 Va. 92, 98 (1982)). Conversely, "[a]n independent contractor is one who undertakes to produce a given result without being in *any way* controlled as to the method by which he attains that result." *S. Floors & Acoustics, Inc. v. Max-Yeboah*, 267 Va. 682, 687 (2004) (emphasis added) (quoting *Craig v. Doyle*, 179 Va. 526, 531 (1942)). He is a person "to whom the owner looks *only for results*." *Creative Designs*, 56 Va. App. at 308 (emphasis added) (quoting *Epperson v. DeJarnette*, 164 Va. 482, 486 (1935)). This analysis is case specific and is to be determined "from the facts of the particular case." *Id.*

In determining whether Connelly was an employee or independent contractor, we look to "four factors: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the individual's work." *Ogunde v. Prison Health Servs.*, 274

- 5 -

Va. 55, 60 (2007). In every case, "the individual circumstances . . . play an important part in answering the query." *Id.* (quoting *The Texas Co. v. Zeigler*, 177 Va. 557, 566 (1941)). "The power or right of control is the most significant factor in determining the character of the relationship, and the most significant inquiry is whether the power or right to control *the means and methods* by which the result is to be accomplished has been reserved." *Walker*, 25 Va. App. at 230 (emphasis added) (quoting *Richmond Newspapers, Inc.*, 224 Va. at 98). "The potential power of control, not the actual exercise of control, is the important element." *Dillon Constr. & Accident Fund Ins. Co. of Am. v. Carter*, 55 Va. App. 426, 431 (2009) (quoting *Va. Emp't Comm'n v. A.I.M. Corp.*, 225 Va. 338, 347 (1983)).

Applying the above principles and the *Ogunde* factors, we have held that a claimant was an employee and not an independent contractor, even when he "elect[ed] to make his own withholding tax payments from his wages," because the employer exercised a significant level of control over the claimant that had "no meaningful distinction" from the control exercised over other "hourly employees." *Id.* at 432, 434. The claimant worked as a "skilled carpenter" for the employer, who monitored his daily progress by telephone or personal visits. *Id.* at 428. At the beginning of each day, the employer told the claimant "what [he] wanted to get done" but "did not interfere with the manner in which [the] claimant performed those tasks" because the claimant was "experienced." *Id.* at 432. Indeed, the employer did not give any of its "skilled carpenters" "specific instructions on how to perform their tasks because they . . . did not need close supervision." *Id.* at 431. Still, the employer "reserved the power to 'ma[k]e decisions about tearing work out as unsatisfactory.'" *Id.*

In holding that those circumstances demonstrated a level of control making the claimant an employee, we emphasized that the employer treated the claimant exactly like the other skilled carpenter, whom the employer considered an employee. *Id.* at 432. The remaining three factors

only emphasized the employer's control: the employer retained sole hiring and firing authority, the claimant was paid hourly and had to submit timecards for each project, and the employer supplied most of the tools needed for the project. *Id.*

Here, we conclude that Connelly was W&M's employee based on the four *Ogunde* factors. First, W&M did not merely look to Connelly for results; it instructed him regarding what he needed to complete each day and required him to submit daily progress reports via the Raken app used by the company. Indeed, Maisel specifically testified that he told Connelly the "means" and "methods" of how to carry out his job when he was on the jobsite. Connelly's working hours were "dictated" by the subcontractor's schedule that W&M created. And he did not participate in the hiring, firing, scheduling, or choosing of any of the subcontractors he supervised.

Similar to the employer in *Dillon*, W&M did not need to specifically "instruct" Connelly on how to manage the subcontractors, as that is not what they do for any of their "regular" employees" because they expected their employees to "know what they're doing." Indeed, to the extent the facts of this case differ from *Dillon*, those differences further emphasize that Connelly was in fact an employee and not a subcontractor. Whereas in *Dillon* we emphasized that the claimant was not treated differently than the other skilled carpenters, here, Maisel and Watson agreed that they exerted *more* control over Connelly then they would for other regular employees.

"Consideration of the remaining three factors underscores the power of control [the employer] possessed over claimant's work." *Dillon*, 55 Va. App. at 432. Past case law is determinative. Like Connelly, the *Dillon* claimant did not have a written contract, the claimant was paid hourly wages pursuant to a timecard, and the claimant paid their own taxes separate from their earnings. *Id.* Additionally, the *Dillon* claimant previously had their own business and

utilized their own truck and phone to complete their current job. *Id.* The *Dillon* claimant did not

have the authority to hire new employees and could also be fired at any time. *Id.*

CONCLUSION

For the above reasons, we reverse the Commission's decision and remand for further

proceedings.

*Reversed and remanded*